KENJI M. PRICE #10523
United States Attorney
District of Hawaii

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
*May 13, 2020*
LIAN ABERNATHY, CLERK

CRAIG S. NOLAN
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
E-mail: Craig.Nolan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | )  MAG. NO. 20-532-RT |
| | ) |
| Plaintiff, | )  CRIMINAL COMPLAINT; |
| | )  AFFIDAVIT IN SUPPORT |
| vs. | ) |
| | ) |
| KEKAI WATANABE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true

and correct to the best of my knowledge and belief:

//

Felon in Possession of Ammunition
(18 U.S.C. §§ 922(g)(1) and 924(a)(2))

On or about May 12, 2020, within the District of Hawaii, KEKAI

WATANABE, the defendant, having been previously convicted of a crime

punishable by imprisonment for a term exceeding one year, and knowing that he

had been convicted of such a crime, knowingly possessed ammunition, with said

ammunition having been previously shipped and transported in interstate and

foreign commerce.

All in violation of Title 18, United States Code, Sections 922(g)(1) and

924(a)(2).

//

//

//

//

//

//

//

//

//

//

//

2

I further state that I am a Special Agent with the United States Bureau of

Alcohol, Tobacco, Firearms and Explosives (ATF). This Criminal Complaint is

based on the following Affidavit which is attached hereto and incorporated herein.

Respectfully submitted,

Joseph Villagomez
Special Agent, ATF

This Criminal Complaint and Affidavit in support thereof were presented to,
approved by, and probable cause to believe that the defendant above-named
committed the charged crime(s) found to exist by the undersigned Judicial Officer
at __11:24__ p .m. on May _13_ , 2020.

Sworn to under oath before me telephonically, and attestation acknowledged
pursuant to Federal Rule of Criminal Procedure 4.1(b)(2), on this _13th_ day of May
2020, at Honolulu, Hawaii.

Rom A. Trader
United States Magistrate Judge

## AFFIDAVIT OF JOSEPH VILLAGOMEZ

Joseph Villagomez, after being duly sworn, deposes and states as follows:

1.      I submit this application and incorporated affidavit in support of the foregoing Criminal Complaint.

2.      The facts in this affidavit come from my personal observations, my training, my experience, and information obtained from other law enforcement officers and agents and from other witnesses. This affidavit is intended to show only that probable cause exists for the proposed charge(s) and does not set forth all of my knowledge or all of the information known to the government about this matter.

### AFFIANT TRAINING, EXPERIENCEAND KNOWLEDGE

3.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since 2014.  I am currently assigned as the Violent Crime Coordinator with the ATF Honolulu Field Office, Honolulu, Hawaii.  I am charged with the investigation and enforcement of violations of federal firearm laws and associated violations.  I graduated magna cum laude with a Bachelor's of Science in Criminal Justice and obtained a Master's Degree in Public Administration and both degrees were conferred by the University of Guam.  I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigation Program and the ATF Special Agent Basic Training Program.  I have attended numerous classes, seminars and training lectures in the investigation of criminal violations of federal laws.  I have conducted numerous firearms-related investigations and obtained and executed both federal search and arrest warrants.  My training and experience include exposure to and investigation of federal crimes involving firearms, narcotics and violence.

4.      During my time in law enforcement, I have become knowledgeable with the enforcement of State and Federal laws pertaining to narcotics and dangerous drugs.  Based on this experience, I have become well versed in the methodology utilized in narcotics trafficking operations, the specific types of language used by narcotic trafficking operations, and the unique trafficking patterns employed by narcotics organizations and their patterns of drug abuse.

## PROBABLE CAUSE

5.    On May 4, 2020, an adult male herein referred to as "Victim" reported to Honolulu Police Department (HPD) that he was kidnapped and threatened with firearms from May 2, 2020 to May 4, 2020.

6.    On May 4, 2020, Victim was interviewed by HPD and related the following;

    a.  On May 2, 2020, at approximately 1335 hours, Victim received multiple text messages from an unknown phone number that he believed to be from an old friend.  To the best of his recollection, the text message conversation was as follows: The unknown number stated, "Yo Bro.  It's me ["Friend 1"]."  Victim responded, "How did we meet?"  The unknown number answered, "Through [Friend 2], Let's catch up and rap."  Victim responded, "OK, where you like meet up?"  The unknown number answered, "at the McCully shopping center underground parking lot."

    b.  At approximately 1345 hours, Victim was driven by a friend herein referred to as "Witness 1" to the McCully shopping center located at 1960 Kapiolani Boulevard in Honolulu to meet Friend 1 as requested in the text messages Victim believed were from Friend 1.

    c.  After arriving at the McCully shopping center, Victim received a text from the unknown number stating that Friend 1 was in a white Mercedes sedan and that Victim should get into the car.

    d.  Victim entered the rear passenger side door of the white Mercedes sedan.  A male seated in the driver's seat introduced himself as "**Spaceman**" and also was referred to as "**Space**," who was later identified, as explained below, as **Jason Matsushige** (hereinafter **Matsushige**).  Female 1, a female acquaintance whom Victim already knew, was seated in the front passenger side seat.

    e.  **Matsushige** had a black handgun resting on his thigh.  **Matsushige** told Victim not to try "anything" or he would shoot Victim.  Victim could not exit the rear doors due to the handle and door being disabled

5

to prevent one from opening the door from the interior of the vehicle.
**Matsushige** told Victim that Female 1 had contacted Victim because
Female 1 owed **Matsushige** money for bailing her out of jail, and
Victim owed Female 1 money for damaging her car, such that Victim
would make good on his debt by assisting **Matsushige**.

f.  Friend 1 and Female 1 were both acquaintances whom Victim had
    met through Friend 2.  Victim does not believe that Friend 1 was
    involved in the kidnapping but that Female 1 used the mutual friend's
    name as a way to deceptively lure him to the shopping center.

g.  **Matsushige** drove the white Mercedes sedan next to the vehicle that
    Witness 1 had driven to the shopping center.  Female 1 exited the
    white Mercedes sedan and began searching Witness 1's vehicle as
    Witness 1 sat compliantly in the driver's seat.  Female 1 re-entered the
    white Mercedes sedan with the numerous items from Witness 1's
    vehicle and **Matsushige** drove the vehicle away from the shopping
    center.

h.  **Matsushige** drove to the Kapahulu area where a male who identified
    himself as "**Skip,**" who was later identified, as explained below, as
    **Kekai Watanabe** (hereinafter **Watanabe**) entered the white
    Mercedes and sat in the front passenger side seat. After entering the
    vehicle, **Watanabe** pointed a black Glock-type handgun at Victim's
    head.  **Watanabe** related that he was an "USO FAM" gang member
    and Victim shouldn't "FUCK" with him or he would kill Victim.

i.  While seated next to Victim in the white Mercedes, Female 1
    repeatedly told Victim to do what **Matsushige** told him to do as she
    monitored text messages on Victim's phone.  Female 1 appeared to be
    sending and deleting information on Victim's phone.  **Watanabe**
    yelled at Victim to "set up" his acquaintances to be robbed.  Victim
    related that he didn't know anyone that would have money or drugs
    for them to rob.  **Watanabe** became angry and accused Victim of
    lying.  **Watanabe** struck Victim once in the head with the barrel of his
    black Glock-type handgun.  Victim felt pain as a result of the strike.

j. **Watanabe**, **Matsushige** and Female 1 took Victim to an apartment building on Ala Wai Boulevard where "**ShortyMac**" resided.  Upon entering the apartment, Victim observed a ballistic tactical type vest and helmet with approximately six unloaded rifle magazines. **Matsushige** later stated that he had robbed a Caucasian male for the tactical gear.

k. "**ShortyMac's**" actual name is **Ashtyn Joseph** (hereinafter **Joseph**). While at the apartment, Victim overheard **Joseph** ask **Matsushige** about someone who was asking about her.  **Joseph** wanted to know who had asked about a female with the last name **Joseph** while she pointed at herself.  Victim later asked **Joseph** her name on a car ride to Ewa.  **Joseph** told him that her name was "**Ashtyn**" and spelled it to Victim.

l. While at **Joseph**'s apartment, Female 1 smoked crystal methamphetamine, which Victim recognized based on his own use of meth multiple times over the past year, and was angry that Victim was lying about not knowing anyone with money or drugs to rob.  Female 1 struck Victim numerous times with her fists causing pain and stated that she and Victim would not get out of there until Victim helped. Female 1 also told him that it would not end well for Victim if he didn't help.  **Matsushige** carried a handgun in his waistband and **Watanabe** carried a handgun in a gray shoulder bag while at **Joseph**'s apartment.

m. **Watanabe** and **Matsushige** instructed Victim to ride with **Joseph** in her vehicle.

n. On May 3, 2020, at approximately 0100 hours, **Joseph** drove Victim to Ewa in her vehicle.  During the drive **Joseph** had a Beretta-type handgun in her left hand and a black semi-automatic handgun in her purse.  **Joseph** pointed the Beretta handgun at Victim and threatened him stating that she would shoot him if he tried to run.  Victim described the handgun as a tip-up palm sized handgun.  Victim could not exit the front passenger door of **Joseph**'s vehicle due to the handle

7

and door being disabled to prevent anyone from opening the door from the interior.

o. At Ewa Victim asked **Joseph** to release him.  **Joseph** responded that **Watanabe** and **Matsushige** would not be happy.  Once in the Ewa area, **Joseph** picked up a male who entered and sat in the rear seat. **Joseph** and the male smoked a clear rock like substance that, based on his own prior use, Victim recognized as crystal methamphetamine.

p. After **Joseph** received a call from **Matsushige**, she drove Victim back to her apartment on Ala Wai Boulevard.  **Watanabe** and **Matsushige** then took Victim in the white Mercedes sedan to the Kapahulu area, where **Watanabe** put Victim in his vehicle, which Victim identified as a white Lexus sedan.

q. **Watanabe** drove Victim to **Matsushige**'s apartment on Date Street. During the ride, **Watanabe** told Victim that he wanted Victim to use his phone to set up his drug-dealing acquaintances to be robbed by **Matsushige** and **Watanabe**.

r. At approximately 1700 hours, a male arrived at the Date Street apartment and purchased a small Ziploc bag, approximately 3" X 2", of crystal methamphetamine for $40 from **Matsushige** and left the unit.

s. Upon entering the Date Street apartment, Victim observed numerous illegal gambling machine type pieces of equipment and identification cards that were in **Matsushige**'s bedroom.  The identification cards belonged to various people who were not present and never seen by Victim and may have been taken during criminal activity. **Matsushige** related that the items were taken in a robbery that he previously committed.

t. In **Matsushige**'s Date Street apartment, Victim observed:

      i. a handgun located in **Matsushige**'s bedroom next to the bed on the floor.

      ii.  two gallon-sized Ziploc bags full of a clear rock like substance resembling crystal methamphetamine and four empty gallon-sized Ziploc bags with clear rock like substance residue resembling crystal methamphetamine in **Matsushige**'s bedroom.

     iii.  two or three sandwich-sized Ziploc bags, each containing approximately four golf ball sized amounts of a black tar like substance that Victim recognized as heroin based on his prior use of and involvement with heroin.

u.  **Watanabe** and **Matsushige** later transported Victim to an illegal gambling game room in the Kapahulu area next to a park. Inside the game room, which was located on the second floor of the building, Victim was introduced to the male whom Victim had seen purchase methamphetamine from **Matsushige**. **Matsushige** stated that the male was an "USO FAM" gang member. Victim related that the male later brandished a silver handgun that was taken from a desk below the game room security video surveillance system. The male wiped the handgun with a red bandana and cocked the gun as Victim observed a round in the chamber.

v.  Victim was instructed to wait in the illegal gambling game room for approximately five hours and was scared to ask the male to be released. Victim remained quiet while he waited. **Watanabe** and **Matsushige** performed what appeared to be approximately ten hand to hand transactions for drugs and money at the game room.

w.  While at the illegal gambling game room, **Matsushige** sold approximately two "8 balls" of crystal methamphetamine to an unknown Asian male who was in his 20's. (Based on my training and experience, I know the term "8 ball" is street vernacular for 1/8 ounce of drugs, such as crystal methamphetamine.) **Watanabe** also showed Victim a snack-sized Ziploc bag of a white powder that he recognized as "Afghan white" and asked him how much it was worth. Victim related to HPD that "Afghan white" is street vernacular for uncut

heroin. Victim related that he had used heroin numerous times in the past year.

x. **Matsushige** and **Watanabe** later transported Victim to a second illegal gambling game room in the Kapahulu area where they met back up with **Joseph**. While at the second illegal gambling game room, **Matsushige** gave Victim $20 and instructed him to play the illegal gambling machines.

y. **Watanabe** and **Matsushige** took Victim from the second game room in the white Mercedes to the neighborhood behind Kapahulu Safeway. They met with an unknown Caucasian male in his 20's. **Matsushige** instructed Victim to get out with him, and **Matsushige** removed a gallon-sized Ziploc bag that was half full with crystal methamphetamine. **Matsushige** gave the Ziploc to the male, who gave **Matsushige** a two-inch stack of US paper currency.

z. **Watanabe** and **Matsushige** eventually transported Victim back to **Matsushige**'s apartment on Date Street. Victim was given a liquid to drink from a bottle. Victim was later told that he was given a liquid that would put him to sleep. Victim became drowsy and fell asleep.

aa. On May 4, 2020, at approximately 1000 hours, Victim awoke and observed **Watanabe** attempting to reinstall his electronic monitoring tag (ankle monitor) on his leg. Victim related that it appeared that **Watanabe** and **Matsushige** both reside at the Date Street apartment. **Watanabe** stated that his Probation Officer was coming to check his electronic monitoring tag. **Matsushige** took Victim in his bedroom and secured the door. **Matsushige** threatened Victim with a firearm and told him to remain quiet while the Probation Officer was there. Victim heard someone come to the apartment who he believed to be the Probation Officer.

bb. **Matsushige** asked **Watanabe** to give Victim back his phone so that he could attempt to set up acquaintances with money and drugs to be robbed.

cc. Victim asked **Matsushige** if he could get something from his backpack in the white Mercedes sedan. **Matsushige** related that he would unlock the Mercedes with the remote and Victim could check his backpack. Victim grabbed his backpack and Witness 1's backpack from the white Mercedes sedan and fled on foot from the area of the apartment.

16. After fleeing from **Matsushige** and **Watanabe**, Victim contacted HPD on May 4, 2020 to report the abduction.

17. In addition to the details above, Victim also told HPD:

a. Victim asked Female 1, **Matsushige**, **Watanabe** and **Joseph** more than ten times to be released but they refused.

b. During the abduction:

i. **Watanabe** struck Victim approximately twice with a handgun and four separate times with his hand.

ii. **Matsushige** struck Victim approximately twice with a handgun and twice with his hand.

iii. **Joseph** threatened to shoot Victim with her Beretta-type handgun during the ride to Ewa.

iv. Female 1 struck and punched Victim approximately ten times.

c. Victim suffered numerous bruises, lacerations and pain to his head and facial areas because of the numerous assaults by Female 1, **Matsushige** and **Watanabe**. (HPD observed and photographed the bruises and lacerations during their interview of Victim.).

d. Victim feared for his life as a result of the assaults and threats by Female 1, **Matsushige**, **Watanabe** and **Joseph**.

11

e. Victim observed **Matsushige** and **Watanabe** smoke a clear rock like substance resembling crystal methamphetamine at least twenty times each during the abduction over the two day span.  Victim also observed Female 1 and **Joseph** also smoke a clear rock like substance resembling crystal methamphetamine numerous times.

18.   On May 4, 2020, Victim's friend Witness 1 was interviewed by HPD, and he related the following:

a. On May 2, 2020, at approximately 1400 hours, Witness 1 transported Victim to McCully shopping center underground parking garage area. Victim told Witness 1 he was meeting a friend there.  Witness 1 parked his vehicle near the ramp entrance area.

b. Victim exited Witness 1's vehicle and walked to a white Mercedes sedan.  Witness 1 did not pay attention to Victim until the white Mercedes sedan pulled next to the passenger side of his vehicle.

c. A female exited the front passenger door of the white Mercedes and opened Witness 1's passenger door.  She started to grab numerous items from his vehicle, and he asked her what she was doing.  The female related that this is what happens when you hang around someone "squirrely."  The female continued to search Witness 1's vehicle as he cooperated and she grabbed Witness 1's cellular phone. The female attempted to grab Witness 1's car keys while he held on. The male driver in the white Mercedes told the female that they didn't need the keys and for her to return.  (As noted above, Victim told HPD that Female 1 entered Witness 1's vehicle.)

d. The female took several items from Witness 1's vehicle.

19.   Witness 1 described the driver of the white Mercedes as an Asian male with short hair.  Witness 1 saw Victim sitting in the rear passenger seat. Victim appeared to be dazed and was staring out of the window, which was partially rolled down.

20.     On May 4, 2020, HPD Officer James Strombach was informed of the details provided by Victim to HPD. Based on the names and descriptions of the four persons involved in the kidnapping, some of the vehicles involves and some of the places they went, Officer Strombach recognized the suspects as a result of his professional contacts with them.

21.     Officer Strombach told investigators that he believed **Space** and/or **Spaceman** was known to him through multiple prior contacts as **Jason Matsushige** (hereinafter **Matsushige**).

22.     Officer Strombach told investigators that he believed **Watanabe** was known to him through multiple prior contacts as Kekai **Watanabe** (hereinafter **Watanabe**).

23.     Officer Strombach told investigators that he believed Shorty and/or ShortyMac was known to him through multiple prior contacts as **Ashtyn Joseph** (hereinafter **Joseph**).

24.     On May 4, 2020, at approximately 2017 hours, Corporal Joseph Pagan met with Victim and administered a blind sequential photographic line up. Victim positively identified **Matsushige** as the suspect whom he knew as **Space** and **Spaceman**.

25.     On May 4, 2020, at approximately 2024 hours, Corporal Pagan met with Victim and administered another blind sequential photographic line up. Victim positively identified **Watanabe** as the suspect whom he knew as **Skip**.

26.     On May 4, 2020, at approximately 2027 hours, Corporal Pagan met with Victim and administered another blind sequential photographic line up. Victim positively identified **Joseph** as the suspect whom he knew as Shorty and ShortyMac.

27.     On May 4, 2020, at approximately 2137 hours, Victim was driven to the area of the underground parking lot of McCully shopping center located at 1960 Kapiolani Boulevard. Victim identified that location as the area where **Matsushige** and Female 1 took him in the white Mercedes sedan.

13

28.     On May 4, 2020, at approximately 2150 hours, Victim was driven to the area of **Joseph**'s apartment located on Ala Wai Boulevard in Honolulu, HI. Victim identified her apartment as where he first met **Joseph** and that had the tactical gear inside.

29.     On May 4, 2020, at approximately 2150 hours, Victim was driven to **Joseph**'s vehicle that was parked in the parking lot of her apartment on Ala Wai Boulevard. The vehicle was previously described by Victim to HPD as having Hawaii license plates PCG908. According to DMV records, Hawaii plate PCG908 is assigned to a 2006 white Kia 4DSD, which is registered to a third party.

30.     On May 4, 2020, at approximately 2210 hours, Victim was driven to **Matsushige's** apartment on Date Street in Honolulu, HI. Victim identified the apartment as the location that he was taken to and held, and the apartment where **Matsushige** resided. Additionally, **Matsushige** previously identified that location for HPD as his residence.

31.     According to DMV records, Matsushige is the registered owner of a white 2010 Mercedes-Benz 4DSD vehicle with Hawaii license plates TJE860. This vehicle matches the description by Victim of the suspect vehicle in which **Matsushige** transported Victim at times during the two-day abduction.

32.     HPD has previously observed **Watanabe** operating a white 2009 Lexus 4DSD with Hawaii license plate PYZ265. This vehicle also matched the description by Victim of the vehicle that Victim was transported in during his abduction. HPD documented Watanabe operating this vehicle on March 8, 2020, when the vehicle was involved in a minor collision. According to DMV records, the vehicle is transfer pending.

33.     On May 5, 2020, Victim gave consent to HPD to extract the contents of his phone relating to the kidnapping. An HPD officer with training in digital forensics examined the phone and discovered pertinent text messages sent and received on May 2, 2020 approximately between the hours of 11:31 am and 1:50 pm: At approximately 11:31 am on May 2, 2020, Victim received a text message from phone number 808-219-5201. In the text conversation that followed, the user of 808-219-5201 suggested meeting at the McCully Shopping Center in order to conduct a drug transaction. The user of 808-219-5201 inquired whether Victim

14

was selling "oxys." (Based on my training and experience, I know that "oxy" is street vernacular for oxycodone, an opioid pain medication and a Schedule 2 controlled substance.) According to the text conversation, it appeared that Victim had approximately thirty pills to sell at $30 each. At approximately 1:26 pm, Victim texted, "Have we met before" and "New phone I don't have a contact for you." At approximately 1:31 pm, the user of 808-219-5201 responded, "Yeah thru [Friend 2]." At approximately 1:42 pm, the user of 808-219-5201 asked, "That you just pulled up?" The extraction also revealed that Victim had three conversations with a person using 808-219-5201 on May 2, 2020 prior to the abduction.

34.    On May 5, 2020, HPD spoke with Victim regarding the contents of the phone extraction. Victim admitted the reason he went to the McCully Shopping Center to meet 808-219-5201 was to conduct a drug transaction.

35.    On May 6, 2020, HPD again spoke with Victim regarding the conversations Victim had with 808-219-5201. Regarding a two minute and ten second phone call at approximately 12:30 pm, Victim stated the content of that conversation was a discussion on where to meet up. After that phone call, Victim realized that it was not Friend 1 who had contacted him and as a result Victim inquired via text about how they knew each other. Regarding a two minute and fifteen second phone call that occurred at approximately 1:36 pm, Victim told HPD the content of that conversation was to tell 808-219-5201 that Victim was at the McCully Shopping Center.

36.    According to the Hawaii Criminal Justice Information System (CJIS), **Watanabe** has been convicted of four crimes punishable by imprisonment for a term exceeding one year:

> a. Robbery 2, in violation of H.R.S. § 708-0841, in 2010, for which he was sentenced to 10 years imprisonment;
>
> b. Possession of Prohibited Firearm, in violation of H.R.S. § 134-0007(B), in 2010, for which he was sentenced to 10 years imprisonment;

    c. Assault 2, in violation of H.R.S. § 707-0711, in 2007, for which he was eventually sentenced at a re-sentencing to 5 years imprisonment; and

    d. Unauthorized Control of Propelled Vehicle, in violation of H.R.S. § 708-0836, in 2007, for which he was eventually sentenced at a re-sentencing to 5 years imprisonment.

37.    On May 6, 2020, the Honorable Rom A. Trader, United States Magistrate Judge of the District of Hawaii, issued search warrants for the residences of and vehicles used by **Matsushige**, **Watanabe**, and **Joseph** in Magistrate Numbers 20-488-RT through 20-492-RT.

38.    On May 12, 2020, law enforcement executed the warrant to search the residence of **Matsushige** and **Watanabe** on Date Street in Honolulu, HI 96826 (hereinafter Date Street Unit) in Magistrate Number 20-489-RT and the warrant to search the 2009 Lexus with Hawaii license plate PYZ265 and VIN JTHBK262395100048 (hereinafter Lexus) in Magistrate Number 20-491-RT.

39.    Immediately prior to the execution of the warrants for the Lexus and Date Street Unit, surveilling officers observed:

    a. **Matsushige** walk from Date Street Unit while in possession of a backpack to the car port for Date Street Unit;

    b. **Watanabe** drive from the street and park the Lexus in the car port for Date Street Unit;

    c. **Watanabe** exit the driver's door of the Lexus and walk around to the trunk of the Lexus where he was met by **Matsushige**; and

    d. a male referred to herein as "Witness 2" seated in the front passenger seat of the Lexus.

40.    Among the items seized in connection with the execution of the two search warrants on Date Street Unit and Lexus were:

16

    a.  from the backpack possessed by **Matsushige** when he walked from Date Street Unit to the car port for Date Street Unit:

          i.  approximately 111 grams gross weight (including packaging) of a black-colored substance suspected to be heroin, a Schedule I controlled substance;

          ii.  approximately 238 grams gross weight (including packaging) of a brown-colored substance suspected to be heroin, a schedule I controlled substance;

          iii.  a revolver loaded with six rounds of ammunition;

          iv.  U.S. paper currency estimated to be in an amount greater than $10,000;

          v.  a digital scale;

          vi.  small baggies commonly used for the distribution of user-level quantities of controlled substances;

          vii.  a checkbook with checks imprinted with **Matsushige's** name; and

          viii.  a title for a vehicle in **Matsushige's** name; and

    b.  from the driver's floorboard in the Lexus where **Watanabe** had been seated, a firearm loaded with ten rounds of ammunition.

    41.    During an interview of **Watanabe** by law enforcement, **Watanabe** stated, in summary and in part, among other things:

    a.  that he lent his Lexus to Witness 2 the night prior;

    b.  the firearm recovered by law enforcement (on the driver's floorboard) was not his;

     c. on multiple occasions, he observed individuals come to the residence he shared with **Matsushige** (Date Street Unit) to purchase "ice" (which I know from my training and experience to be street vernacular for methamphetamine, a Schedule II controlled substance) from **Matsushige**;

     d. sometimes **Matsushige** would give **Watanabe** ice so **Watanabe** could smoke it; and

     e. **Watanabe** saw **Matsushige** with firearms and guessed that **Matsushige** used the firearms for protection.

    42.   During an interview of Witness 2 (the front passenger in the Lexus) by law enforcement, Witness 2 stated, in summary and in part, among other things:

     a. earlier that day, Witness 2 was walking in the Kapahulu area when **Watanabe** saw him and picked him up in the Lexus;

     b. **Watanabe** was driving the Lexus and there was no one else in the car;

     c. after **Watanabe** picked up Witness 2, they drove to the Date Street Unit;

     d. the firearm recovered from the Lexus was not his; and

     e. the only items in the vehicle that belonged to Witness 2 were a cellphone, which actually belonged to his girlfriend, and two shirts.

    43.   Law enforcement field-tested the black substance seized from **Matsushige's** backpack, with the substance testing presumptive positive for heroin, a Schedule I controlled substance. Based on my training and experience, and based on my consultations with other law enforcement officers who have even greater knowledge about controlled substances, I believe the brown substance seized from **Matsushige's** backpack also to be a type of heroin, a Schedule I controlled substance. Testing of the brown substance was reserved for forensic personnel based on the collective knowledge of the law enforcement officers involved that properties of the brown heroin can change upon the opening of the

sealed packaging.  Furthermore, based on my training and experience, and based on my consultations with other law enforcement officers who have even greater knowledge about controlled substances, I know that the combined weight of the black and brown-colored heroin is well over 100 grams when the weight of the packaging is excluded.

44.    Based on my training and experience, I know that quantities of more than 100 grams of heroin (and even amounts well under 100 grams) are indicative of distribution and well above amounts typical possessed by those who merely use heroin; digital scales and baggies of the type seized from **Matsushige's** backpack are used by those distributing narcotics to measure and package small, user-level quantities for sale to drug users; and that firearms are tools of the drug trade used by those distributing narcotics to protect their stash of narcotics, their proceeds of sales of narcotics, and themselves from robbery, and also to intimidate drug buyers and others involved in the distribution of narcotics.

45.    I have examined the loaded revolver seized from **Matsushige's** backpack, and based on my training and experience determined that the revolver is a Smith and Wesson .357 Magnum caliber, and meets the definition of "firearm" under 18 U.S.C. § 921(a)(3).

46.    In addition to my training and experience described above, I have received specialized training from ATF regarding the Interstate Nexus element of select federal firearm crimes and have been deemed qualified by ATF to provide opinion testimony in this area.  I have examined the ammunition contained within the firearm seized from the driver's floorboard in the Lexus parked by **Watanabe** just before execution of the warrant to search that vehicle, and I have determined that the ammunition was manufactured outside of the State of Hawaii and meets the definition of "ammunition" under 18 U.S.C. § 921(a)(17).  In light of that determination, the ammunition must have traveled in interstate or foreign commerce prior to being possessed by **Watanabe** in Hawaii.

47.    On May 12, 2020, law enforcement also executed the warrant to search the 2006 Kia with Hawaii license plate PCG908 and VIN KNAFE161965244904 (hereinafter Kia) in Magistrate Number 20-492-RT.  At the commencement of the execution, **Joseph** was the sole occupant and operator of the Kia.

19

48.     Among the items seized in connection with the execution of the Kia search warrant were:

   a. a black-colored substance suspected to be heroin, a Schedule I controlled substance;

   b. U.S. paper currency estimated to be in an amount greater than $2,500;

   c. a pistol loaded with ammunition from a handbag sitting on the passenger seat; and

   d. a glass pipe with a bulbous end that appeared to contain residue from a controlled substance.

49.     Law enforcement field-tested the black substance seized from the Kia under **Joseph's** control, with the substance testing presumptive positive for heroin, a Schedule I controlled substance.

50.     Furthermore, I have examined the firearm seized from the Kia under **Joseph's** control, and determined that the firearm is a Smith and Wesson 9mm Parabellum pistol and that the pistol was manufactured outside of the State of Hawaii and meets the definition of "firearm" under 18 U.S.C. § 921(a)(3).  In light of that determination, the firearm must have traveled in interstate or foreign commerce prior to being possessed by **Joseph** in Hawaii.

51.     According to HPD records, in December 2018, **Joseph** was arrested in the State of Hawaii for Promoting a Dangerous Drug in the Third Degree, a felony. During that arrest, **Joseph** was in possession of a backpack.  Sticking out of the side pocket of the backpack was a glass cylindrical pipe with a bulbous end containing burnt white residue. The residue was tested by HPD and was found to contain methamphetamine, a Schedule II controlled substance.

//

//

//

52.     Based on the foregoing, I believe probable cause exists to charge the named defendant with the crime(s) delineated in the foregoing Criminal Complaint.

Respectfully submitted,

Joseph Villagomez
Special Agent, ATF

Sworn to under oath before me telephonically, and attestation acknowledged pursuant to Federal Rule of Criminal Procedure 4.1(b)(2), on this  13th  day of May 2020, at Honolulu, Hawaii.

Rom A. Trader
United States Magistrate Judge